UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARLES SUMNER SCOTT, IV, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 19-12552-LTS |
| | ) |
| ANDREW SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM AND ORDER

February 25, 2021

SOROKIN, J.

Charles Sumner Scott, IV seeks reversal and remand of a decision by Andrew M. Saul, the Commissioner of Social Security ("Commissioner"), to deny his application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Scott asserts that the decision of the Administrative Law Judge ("ALJ") was erroneous, and he was improperly denied benefits as a result. Pending before the Court are Scott's Motion for Order Reversing the Decision of the Commissioner (Doc. No. 14) and the Commissioner's Motion to Affirm the Commissioner's Decision (Doc. No. 23). For the reasons that follow, these motions are ALLOWED IN PART and DENIED IN PART, and the case is REMANDED to the ALJ for further proceedings consistent with this opinion.

I.   **BACKGROUND**

   A.  **Procedural History**

Scott's case is before this Court after a longer than typical history for Social Security

matters. Scott originally applied for SSI and DIB in June 2013, alleging an onset of disability of

December 5, 2012 due to a herniated disk in his lower back and depression. A.R. at 287–97,

349.[1] The SSI application was denied based on a determination that he was financially ineligible.

Id. at 127. Scott's DIB application was also denied in November 2013, and he filed a timely

request for a hearing in front of an ALJ. Id. at 89–102. A hearing in front of ALJ Daniel J.

Driscoll was held on November 4, 2014. Id. at 34–62. By decision on January 14, 2015, the ALJ

found Scott was not disabled. Id. at 103–18.

Thereafter, Scott requested review of the ALJ's decision. The Appeals Council granted

Scott's request for review, and in an order dated March 22, 2016 remanded the case for a new

hearing and decision.[2] Id. at 123–26. A subsequent hearing was held before ALJ Driscoll on May

23, 2017. Id. at 63–88. On June 28, 2017, ALJ Driscoll issued a written decision finding that

Scott was not disabled, and the Appeals Council denied Scott's request for review. Id. at 13–33;

768–72. Scott then filed a complaint in the United States District Court for the District of New

Hampshire. Id. at 773–78. That Court remanded Scott's case in September 2018 because the ALJ

based his residual functional capacity ("RFC") finding on the opinion of state agency physician

Dr. Louis Rosenthall, whose opinion was given only partial weight because he did not review a

---

[1] Citations to "A.R." are to the administrative record, which appears as Doc. No. 13 on the docket in this matter. Page numbers are those assigned by the agency and appear in the lower right-hand corner of each page.

[2] The Appeals Council concluded that the ALJ had failed to adequately evaluate the opinion of a consultative examiner and did not make adequate findings to support his conclusion that Scott had failed to follow prescribed treatment. A.R. at 123–26.

complete record at the time he offered his opinion. Id. at 779–87. The Court noted that the ALJ

"did not explain what evidence was generated after Dr. Rosenthall's review" and "added

functional limitations and environmental restrictions without relying on any medical opinion to

support that assessment." Id. at 784–85.

Meanwhile, in July 2018, Scott (now a Massachusetts resident) filed a subsequent

application for DIB, which was initially denied. Id. at 793–821, 827–29, 888–89. In January

2019, the Appeals Council remanded Scott's original case back to the ALJ and ordered

consolidation of the original case with Scott's subsequent application. Id. at 790–92.

On July 18, 2019, ALJ Timothy Belford held a hearing in Lawrence, Massachusetts. Id.

at 702–46. ALJ Belford issued a third decision unfavorable to Scott on September 18, 2019,

finding that Scott had not been disabled from his alleged disability onset date of December 5,

2012 through December 31, 2017, Scott's date last insured ("DLI"). Id. at 678–93. Scott then

filed this action in the United States District Court for the District of Massachusetts on December

20, 2019.

## B.  The 2019 ALJ Decision

In determining that Scott was not disabled, ALJ Belford went through the five-step

process used to determine whether a claimant is disabled for the purposes of SSI.[3] A.R. at 682–

---

[3] The First Circuit has framed the five steps as follows:

> The steps are: 1) if the applicant is engaged in substantial gainful work activity, the
> application is denied; 2) if the applicant does not have, or has not had within the
> relevant time period, a severe impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the conditions for one of the
> "listed" impairments in the Social Security regulations, then the application is
> granted; 4) if the applicant's "residual functional capacity" is such that he or she
> can still perform past relevant work, then the application is denied; 5) if the
> applicant, given his or her residual functional capacity, education, work experience,
> and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920).

83. At step one, the ALJ found that Scott had not engaged in substantial gainful activity from the December 2012 alleged onset date through December 31, 2017, his DLI. Id. at 683. At step two, the ALJ found Scott had the following severe impairments through the DLI: spine disorder, degenerative disc disease of the lumbar spine post fusion, depression, and anxiety. Id. At step three, the ALJ determined that through the DLI, Scott's impairments did not meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix l (20 CFR 404.1520(d), 404.1525 and 404.1526) such that the Commissioner would be required to deem him disabled. Id. at 685. At step four, the ALJ found that Scott had the RFC to perform "light work" with the following additional limitations:

> the claimant can stand or walk for four hours; his ability to sit is unrestricted; no more than occasional climbing of ramps or stairs; no climbing of ladders; no more than occasional balancing, stooping, crawling, kneeling, and crouching; no more than occasional exposure to temperature extremes, and workplace hazards such as unprotected heights, and dangerous moving machinery; the claimant is limited to simple, routine tasks with only occasional workplace changes; and no more than occasional interaction with coworkers, supervisors, and the public.

Id. at 686. In making this finding, the ALJ noted that Scott's testimony—which alleged significant limitations stemming from his back pain, depression, and anxiety—was "not entirely consistent with the medical evidence and other evidence in the record . . .." Id. The ALJ viewed Scott's testimony as inconsistent "because the evidence of record before the claimant's date of last insured reflects only moderate pain symptoms and objective signs with only conservative treatment." Id. at 687.

For Scott's physical impairments, the ALJ gave great weight to the opinions of State agency medical consultants Lisa Venkataraman, M.D., and Paula Cioffi, M.D., who reviewed the evidence of record available at both the initial and reconsideration levels of Scott's case, and whose opinions the ALJ found to be consistent with the evidence of record before the DLI. Id. at

4

688. The ALJ gave partial weight to the opinion of State agency medical consultant Louis

Rosenthall, M.D., whose opinion was partially consistent with the evidence but who did not have

access to the full evidence of record before the DLI. Id. at 688–89. The ALJ gave little weight to

the opinion of William Kirmes, D.O., who completed a consultative examination, because his

opinion was inconsistent with the evidence of record, Dr. Kirmes was unsure if his assessment

was valid and was confused by some of the findings, and it was a one-time examination. Id. at

689. Finally, the ALJ gave little weight to the opinion of Manuel Sanchez, M.D., Scott's treating

medical provider, because Dr. Sanchez did not begin treating Scott until after the DLI, and his

opinions were inconsistent with the evidence of record before the DLI. Id. at 689–90.

For Scott's mental impairments, the ALJ gave great weight to the opinions of Laura

Landerman, Ph.D., John Warren, Ed.D., and Lawrence Fieman, Ed.D. Id. at 690. These opinions

were given great weight because they were generally consistent with the evidence of record prior

to Scott's DLI, which reflected little treatment with only mild to moderate mental health

objective signs. Id. The ALJ gave little weight to Sandra Vallery, Ph.D., who completed two

psychological consultative examinations of Scott, because Dr. Vallery's opinion was inconsistent

with the evidence of record, and her two one-time assessments occurred years apart and thus

"provide[d] little insight into the limitations flowing from the claimant's impairments." Id.

The ALJ concluded step four by finding that Scott could not do any of his past relevant

work. At step five, the ALJ found, based on the testimony of a vocational expert, that Scott could

do a significant number of other light and sedentary jobs, including hand packager inspector,

price marker, electrical assembler, table worker, surveillance systems monitor, and document

preparer. Id. at 691–92. Accordingly, the ALJ found that Scott was not disabled through

December 31, 2017, the DLI. Id. at 692.

## II.  LEGAL STANDARD

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Id. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); accord Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); see Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56–57 (1st Cir. 2003) (noting substantial evidence is less than a preponderance of the evidence). This standard of review "is more deferential than it may sound to the lay ear." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018). Conversely, where the Commissioner's finding is not supported by substantial evidence or is the result of an error of law in the evaluation of the claim, the Court will not uphold it. 42 U.S.C. § 405(g).

Where the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991); see Richardson, 402 U.S. at 399 (noting resolution of conflicts in evidence, including medical evidence, is the Commissioner's task). As the Supreme Court has emphasized, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."  Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 523 (1981) (internal quotations omitted). Administrative findings of fact are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging

matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

Moreover, an ALJ is not permitted to "substitute his own layman's opinion for the findings and

opinion of a physician," Gonzalez Perez v. Sec'y of Health & Human Servs., 812 F.2d 747, 749

(1st Cir. 1987), nor may he disregard relevant medical evidence. Nguyen, 172 F.3d at 35.

      ALJs commonly review assessments provided by three categories of medical experts:

sources who have treated the claimant for their impairments ("treating sources"), sources who

have examined the claimant for purposes of rendering an opinion in connection with their

disability claim, and sources who have reviewed the claimant's medical records in order to

render an opinion in connection with the claim but have not treated or examined the claimant.

See generally 20 C.F.R. § 404.1527.[4] "A treating source's opinion on the question of the

severity of an impairment will be given controlling weight so long as it 'is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the] record.'" Polanco-Quinones v. Astrue, 477 F. App'x

745, 746 (1st Cir. 2012) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)). In other words,

there is "a general presumption of deference to the treating physician's opinion." Abubakar v.

Astrue, No. 1:11-cv-10456-DJC, 2012 WL 957623, at *8 (D. Mass. Mar. 21, 2012). However,

the opinion of a treating physician need not be given controlling weight where the ALJ

determines that it is inconsistent with the other substantial evidence in the case record. 20

C.F.R. 404.1527(c)(4) ("[T]he more consistent a medical opinion is with the record as a whole,

the more weight we will give to that medical opinion"); see generally Falcon-Cartagena v.

Comm'r of Soc. Sec., 21 F. App'x 11, 12-13 (1st Cir. 2001) (per curiam) (a treating

---

[4] 20 C.F.R. § 404.1527 applies to claims filed before March 27, 2017 (which includes Scott's claim). For claims filed after March 27, 2017, 20 C.F.R. § 404.1520c applies instead.

physician's opinion is given less weight when it is inconsistent with the balance of evidence on record).

Where an ALJ does not give controlling weight to a treating physician's opinion, he must determine how much weight to accord the opinion based on the following factors:

> 1) length of treatment relationship and frequency of examination; 2) nature and extent of the treatment relationship; 3) how well supported the conclusion is by relevant evidence; 4) how consistent the opinion is with the record as a whole; [and] 5) how specialized the knowledge is of the treating physician.

Abubakar, 2012 WL 957623, at *9. The ALJ need not expressly discuss each factor, but must give "good reasons" for the weight afforded to a treating source's medical opinion. Bourinot v. Colvin, 95 F. Supp. 3d 161, 177 (D. Mass. 2015) (citing 20 C.F.R. § 404.1527(c)(2)).

The opinions of other examining and non-examining sources are accorded weight based on the extent to which they are supported by relevant evidence, whether they are consistent with the rest of the medical record, the level of specialized knowledge demonstrated by the source, and any other relevant factors. Abubakar, 2012 WL 957623, at *11. The opinion of a non-treating physician may satisfy the substantial evidence standard where an ALJ determines not to give controlling weight to a treating physician's opinion and it is clear that the non-treating examiner reviewed the claimant's medical findings with care. See Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991) (affirming a non-treating doctor's medical opinion as substantial evidence); Agrón-Bonilla v. Comm'r of Soc. Sec., Civil No. 08-2111-DRD-JA, 2009 WL 4670538, at *5 (D.P.R. Dec. 9, 2009) (affirming ALJ denial of benefits that relied on opinions of non-treating state agency physicians). Ultimately, where the findings of a claimant's treating physician differ from those of other examining and non-examining sources, "it is the Secretary's responsibility to choose between conflicting evidence." Burgos Lopez v. Sec'y of Health & Human Servs., 747 F. 2d 37, 41 (1st Cir. 1984).

While the ALJ must consider all available evidence, he is "not obligated to discuss every bit of evidence." Frost v. Barnhart, 121 F. App'x 399, 400 (1st Cir. 2005) (per curiam). Rather, there is a presumption "that the ALJ has considered all of the evidence before him." Quigley v. Barnhart, 224 F. Supp. 2d 357, 369 (D. Mass. 2002).

## III. DISCUSSION

Scott moves for remand based on two issues: first, that the ALJ erroneously evaluated Scott's testimony regarding his symptoms and limitations in determining his RFC, and second, that the ALJ erroneously evaluated the opinion evidence of record in determining Scott's RFC. Doc. No. 15 at 1. The Court considers each in turn.

### A.  The ALJ's Evaluation of Scott's Testimony

Scott contends that the ALJ's evaluation of his subjective testimony is not supported by substantial evidence, and that the ALJ neglected to consider that Scott lacked medical insurance or the ability to afford certain treatments for a three-year period. Doc. No. 15 at 24–26.

At his July 2019 hearing, Scott provided the following testimony. He stated that he has not worked since December 2012, when he injured his back while working for a construction company. A.R. at 710. He testified that he continues to experience significant pain symptoms in has back and legs as well as stiffness and spasms. Id. at 722, 729–31. His course of treatment for back pain first involved trying steroid injections and swimming therapy, and he has used Tylenol, ibuprofen, and cannabis to regulate the pain. Id. at 714–15. In 2013, Scott treated with Vicodin and Percocet but had to stop treatment due to nausea and lapses in health insurance coverage. Id. at 717. He stated that he did not have insurance from 2014 through 2017 but was still able to get medication for a while. Id. at 718. Scott testified that he was constantly up throughout the day because of his pain, and without cannabis, he could only sit for five to ten

9

minutes at a time on a bad day, and twenty-five minutes on a good day. Id. at 720. He noted that he could only stand for maybe two to three minutes. Id. at 722. Scott testified that he was using a cane since his accident in December 2012. Id. at 723. Scott testified that he never sought treatment for any mental health issues because of financial inability. Id. at 726. He stated that depression and anxiety have affected his demeanor and memory and that he would not be able to focus in a work environment. Id. at 726–27.

The credibility determination of an ALJ who "observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987). The ALJ made specific, record-based findings based on the evidence and noted where Scott's reports of persistent and debilitating symptoms were inconsistent with the record evidence. In particular, the ALJ pointed to record evidence of moderate pain, normal gait and posture, normal musculoskeletal range of motion, moderate mental health symptoms, and conservative and sparse treatment. A.R. at 687–88. Broadly speaking, the ALJ's opinion found a lack of objective medical evidence to support the severity level of Scott's impairments as he alleged in his testimony. Moreover, the ALJ does not omit from his opinion that Scott was impeded by financial difficulties and gaps in insurance. He notes that even "recogniz[ing] the financial struggles [that] limited the claimant's ability to attain medical care after 2013," the record still "does not reflect ongoing significant pain symptoms or physical limitations," nor did medical professionals note objective signs that Scott was limited by back pain and mental health issues during appointments in July and October 2014. Id. at 687. Accordingly, the Court will not disturb the ALJ's weighing of Scott's testimony. The ALJ's conclusions here are based on substantial evidence, and it cannot be said that no "reasonable

mind, reviewing the evidence in the record as a whole, could accept [that evidence] as adequate to support his conclusion." Teague v. Colvin, 151 F. Supp. 3d 223, 226 (D. Mass. 2015) (quoting Rodriguez, 647 F.2d at 222). Thus, Scott's Motion to Reverse is DENIED as to the issue of whether the ALJ erroneously evaluated Scott's testimony, and the Commissioner's Motion to Affirm is ALLOWED as to this issue.

### B. The ALJ's Evaluation of the Opinion Evidence of Record

#### 1. Dr. Vallery

Regarding the opinion evidence about his mental limitations, Scott contends the ALJ erroneously gave little weight to the examination opinions of Sandra Vallery, Ph.D., and failed to explain why Dr. Vallery's more extensive limitations were not incorporated in the RFC. Doc. No. 15 at 23–24.

Scott presented to Dr. Vallery twice for psychological consultative examinations. The first occurred on October 22, 2013. A.R. at 598–602. Scott drove himself to the appointment because he could not get a ride. Id. at 598. Scott reported to Dr. Vallery that he was not in therapy for his mental health and never had a psychiatric hospitalization. Id. at 599. Scott reported that the only medication he took was Motrin. Id. He stated that he had difficulty with crowds; he felt depressed, fatigued, hopeless, helpless, worthless, and irritable; and his concentration was "so-so." Id.

Dr. Vallery's mental status examination reported the following: Scott was oriented x3 and cooperative; memory was fair-to-good; he appeared to have average intelligence; eye contact was good; speech was sparse, soft-spoken, and goal directed; mood was depressed with some anxiety and affect was constricted; there was no evidence of psychosis and he denied any suicidal ideations; and insight and judgment were good. Id. at 600. Scott reported that he often

11

falls asleep on his chair; showers daily; sometimes brings his daughter to work; "mopes" around the house; naps twice a day; occasionally visits with his mother; keeps doctors' appointments; stays on top of his dog's appointments; uses a computer; watches television; spends time sitting in his chair; sometimes prepares meals; goes outside with the dog; sometimes takes out the trash; and takes care of grooming, hygiene, and personal affairs. Id. at 600–01. Scott stated that he does not do physical therapy exercises that were recommended to him. Id. at 600.

Dr. Vallery opined that Scott was not able to tolerate stressors common to the work environment given his depression and preoccupation with stress, but could interact appropriately and communicate effectively with family members and friends; understand instructions and remember short and simple instructions; maintain attention; concentrate, persist, and pace himself, and complete tasks; and make simple decisions, maintain attendance and interact appropriately with supervisors. Id. at 601. Dr. Vallery diagnosed Scott with major depression, anxiety disorder NOS, and PTSD, with a "good" prognosis with treatment, including medication and therapy. Id.

On April 17, 2017, Scott presented to Dr. Vallery for a second consultative examination Id. at 672–77. Scott reported that he was not in therapy because he had no insurance and could not afford it, and he never had a psychiatric hospitalization. Id. at 672–73. He was taking no medication. Id. at 674. Scott reported problems sleeping and concentrating, and stated that he felt depressed, irritable, fatigued, and guilty. Id. at 673. On examination, Dr. Vallery noted that Scott showed depressed mood and flat affect, but otherwise was cooperative with appropriate behavior; had soft-spoken, sparse, and goal-directed speech; had no psychosis or suicidal or homicidal ideations; had intact orientation, average intelligence, and fair to good memory; was able to be attentive and concentrate; and had adequate fund of information. Id. at 673-74.

Dr. Vallery also summarized Scott's daily activities, noting that he reported that he wakes up and lies in bed, eventually going downstairs to sit at the table and have coffee. Id. at 674. He walks around his home due to physical discomfort; showers once every four to five days; tries to nap; visits with his mother sometimes; and may listen to music sometimes. Id. Dr. Vallery noted that Scott was not able to consistently learn new information and recall information given his depression and preoccupation with physical problems, but could use information to perform work activities. Id. at 674–75. She opined that Scott's communication in the workplace would be challenged and not consistently effective due to his depression and preoccupation with physical problems. Id. at 675. She opined that Scott is able to focus his attention, but not able to stay on task for a sustained rate. Id. Dr. Vallery also opined that Scott is able to regulate his emotions and control his behavior, but not able to consistently maintain well-being in the work setting given his depression and focus on his physical problems. Id. Dr. Vallery diagnosed Scott with major depression, unspecified anxiety disorder, and panic disorder with some agoraphobia. Id. She noted the prognosis was fair-to-good and Scott was a good candidate for treatment. Id.

On the same date, Dr. Vallery completed a medical source statement, in which she opined that Scott had only at most "mild" limitations in the domains related to the ability to understand, remember, and carry out instructions; and at most "mild" limitations in the ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in a routine work setting. Id. at 656–57.

The ALJ did not err in deciding to give Dr. Vallery's opinion little weight. The evidentiary weight afforded to non-treating medical professionals may "vary with the circumstances, including the nature of the illness and the information provided the expert." Berrios Lopez, 951 F.2d at 431 (internal citation omitted). First, Dr. Vallery's findings are

internally inconsistent—while her April 2017 evaluation described Scott's mental impairments as severe, she completed an opinion on the same day indicating that he only had mild impairment in functioning. Compare AR 673–74 with AR 656. This shift makes it difficult to discern her true opinion as to Scott's limitations. To the extent that Dr. Vallery's opinion is more restrictive than the RFC, the ALJ reasonably found that her opinions were not consistent with the record, which showed evidence of normal mental functioning, that Scott had no prior mental health treatment, and had never been hospitalized for any mental health issues. A.R. at 690 (citing id. at 1129–30, 1140–41); see also id. at 1024, 1118, 1132, 1136, 1145, 1227, 1231, 1242. Moreover, the ALJ's determination that the record reflected little to no mental health treatment, and that this conservative approach contradicted Dr. Vallery's opinion, is itself sufficient to support his decision to grant little weight to Dr. Vallery's opinion. See McNelley v. Colvin, No. 15-1871, 2016 WL 2941714, at *2 (1st Cir. Apr. 28, 2016) (1st Cir. Apr. 28, 2016) (holding that "conservative treatment with only medical management" constitutes substantial evidence to support an ALJ's decision to give less weight to one medical source than another); Ramos v. Barnhart, 119 F. App'x 295, 296 (1st Cir. 2005) (same). The ALJ did not err in affording Dr. Vallery's opinion little weight. Scott's Motion to Reverse is DENIED as to the issue of whether the ALJ erred in giving little weight to Dr. Vallery's opinion, and the Commissioner's Motion to Affirm is ALLOWED as to this issue.

### 2. Dr. Rosenthall

Turning to the opinion evidence about his physical limitations, Scott contends that the ALJ erred in giving partial weight to the November 2013 opinion of reviewing consultant Louis Rosenthall, M.D. Doc. No. 15 at 22. In particular, he contends that the ALJ erred in not incorporating into the RFC Dr. Rosenthall's opinion that Scott required a cane for ambulation,

and this error is not harmless because "it is unlikely that an individual who required the use of a hand-held assistive device to ambulate could perform the requirements of the full range of jobs identified in the vocational expert's testimony . . .." Id.

Dr. Rosenthall reviewed the evidence of record on November 7, 2013 and conducted a function-by-function evaluation of Scott's abilities. He opined that Scott could lift and/or carry twenty pounds occasionally (i.e., up to one-third of a workday) and ten pounds frequently (i.e., up to two-thirds of a workday); he could stand, walk, and/or sit for about six hours in a workday; a cane was "necessary for ambulation";[5] he could occasionally climb, balance, stoop, kneel, crouch, and crawl; he had to avoid even moderate exposure to hazards, but could tolerate unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, and respiratory irritants such as fumes; and he had no manipulative, visual, or communicative limitations. A.R. at 95–97.

The ALJ afforded Dr. Rosenthall's opinion partial weight because his opinion was partially consistent with the evidence of record, and because Dr. Rosenthall did not have access to the full evidence of record before the DLI when providing his opinion. Id. at 688–89. In giving Dr. Rosenthall partial weight, the ALJ noted that the full record and the 2018 opinions of Dr. Venkataraman and Dr. Cioffi supported "a more significant limitation" than Dr. Rosenthall

---

[5] Dr. Rosenthall provided the following explanation about his opinion that a cane was "necessary for ambulation":

> [Scott] alleges need for cane to ambulate on self-stated [Function Report], co[rr]oborated [at the mental consultative examination]; however, gait was documented as normal at two E[pidural] S[teroid] I[njection] app[ointment]ts (Hacobian 6/4/13 & 7/9/13), and exams by two providers since A[lleged] O[nset] D[ate] (Crawford 1/13 & Hacobian 2/13) document normal L[ower] E[xtremity] motor function [Tr. 95] bilaterally. Despite such discrepancies, [Plaintiff] should have use of cane throughout workday [because it is necessary for ambulation].

A.R. at 95–96.

opined, particularly with regards to Scott's ability to perform postural positions. Id. at 689. The ALJ was not bound to incorporate cane use as a restriction in the RFC: the 2018 opinions of Dr. Venkataraman and Dr. Cioffi did not include any such limitation; Dr. Rosenthall's opinion noted discrepancies in Scott's description of his limitations and the opinion related to cane use was primarily based on Scott's subjective reports;[6] and a review of the record does not show that a cane was ever prescribed as medically necessary.[7] The ALJ did not err in excluding this restriction from the RFC. Cf. Durfee v. Berryhill, No. CV 16-079M, 2017 WL 877272, at *5 (D.R.I. Feb. 15, 2017) (noting that "even if the medical evidence is mixed, there is no error in the ALJ's determination to accept substantial evidence supportive of the exclusion of the use of a cane from the claimant's RFC; such a determination falls within the ALJ's 'zone of choice'"), report and recommendation adopted, No. CV 16-79-M, 2017 WL 875825 (D.R.I. Mar. 3, 2017). The ALJ sufficiently weighed how well-supported Dr. Rosenthall's opinion was by relevant evidence, the opinion's consistency with the record as a whole, and Dr. Rosenthall's level of knowledge. See Abubakar, 2012 WL 957623 at *11. Thus, Scott's Motion to Reverse is DENIED as to the issue of whether the ALJ erred in giving partial weight to Dr. Rosenthall's opinion, and the Commissioner's Motion to Affirm is ALLOWED as to this issue.

---

[6] Specifically, Dr. Rosenthall noted that "[o]verall, [Scott's] self stated limitations are not supported by the [medical evidence of record]; such discrepancies partially detract from claimant's credibility." A.R. at 97.

[7] While the consultative examiner, Dr. Kirmes, also stated that Scott needed a cane to ambulate, he did not indicate any clinical support for this finding apart from Scott's unsteadiness of gait and noted that he was unsure if his assessment was actually valid. A.R. at 689. Dr. Sanchez also discussed cane use, but his opinion is not corroborated by contemporaneous evidence within the period prior to Scott's DLI. As discussed below, the ALJ did not err in awarding Dr. Kirmes' or Dr. Sanchez's opinions little weight.

### 3. Dr. Kirmes and Dr. Sanchez

Scott contends that the ALJ erred in giving greater weight to the opinions of non-examining reviewing consultants than to the April 2017 examining opinion of William Kirmes, D.O., or the 2018 opinions of Scott's treating physician, Manuel Sanchez, M.D. Doc. No. 15 at 23. The ALJ afforded little weight to both opinions. A.R. at 689.

Scott saw Dr. Kirmes for an orthopedic/osteopathic examination on April 17, 2017. Id. at 666–71. Scott denied fatigue and weakness; he complained of pain, asthma, difficulty breathing, and shortness of breath on exertion. Id. at 666–67. Dr. Kirmes examined Scott and made findings including that his gait was antalgic, that he walked with a cane, and had reduced range of motion in the cervical and lumbar spine, but ultimately reported that "some of the findings on [Scott's] physical exam were confusing." Id. at 668–69. He opined that Scott "is in an inordinate amount of pain in my opinion for somebody who has been hurting for four and a half years. Any slight movement caused him to wince in pain. His interpersonal behavior was therefore somewhat inappropriate. He seemed to be modifying his pain somewhat." Id. at 667. In addition, Dr. Kirmes stated that Scott may not have been giving maximum effort when Dr. Kirmes tested Scott's strength and range of motion. Id. at 668.

Dr. Kirmes completed a Medical Source Statement and opined that Scott was unable to lift or carry up to ten pounds due to pain; he could sit for two hours at a time and stand or walk for one hour at a time in an eight-hour workday; he could sit for three hours total, stand for two hours total, and walk for two hours total; he could reach only occasionally (i.e., for up to one-third of the time); he could never do postural activities except climb stairs and ramps occasionally; had no limitation on his ability to use his hands for gross motor skills; he had no limitation on his ability to use his fingers for fine motor skills; he had no limitation on his

abilities to push and/or pull; and he could never operate foot controls. Id. at 659–61. Dr. Kirmes also opined that Scott could ambulate without the use of a cane for twenty feet and required the use of a cane to ambulate longer distances. Id. at 660. Although the document that Dr. Kirmes completed contained a field asking him to identify the particular medical or clinical findings supporting that opinion, Dr. Kirmes left that field blank except to note Scott's unsteady gait without the use of a cane. Id. at 660, 663.

Scott saw Dr. Sanchez for pain management related to his back pain in April 2018, four months after his DLI, and Dr. Sanchez completed medical opinion statements in July 2018, November 2018, and May 2019. Id. at 1087–91, 1103–06, 1111, 1254. Dr. Sanchez opined that Scott was essentially precluded from all work due to extreme limitations in functioning, and these impairments began in December 2012. Id. at 1087–91, 1098. He stated that Scott was "fully disabled and has no work capacity at this point." Id. at 1106. Further, Dr. Sanchez's opinion included that Scott suffered from severe pain, could not sit for more than fifteen minutes at a time or for more than two hours total in an eight-hour workday, and required the use of a handheld assistive device to ambulate. Id. at 1087–91.

"[I]t is well settled that an ALJ is not obligated to accept a treating physician's conclusions." Hill v. Colvin, No. CIV.A. 13-11497-DJC, 2015 WL 132656, at *7 (D. Mass. Jan. 9, 2015) (citing Guyton v. Apfel, 20 F. Supp. 2d 156, 167 (D. Mass. 1998)). Moreover, an ALJ may give greater weight to nontreating physicians based on the record and the circumstances of a case. See, e.g, D.A. v. Colvin, No. CIV.A. 11-40216-TSH, 2013 WL 5513952, at *8 (D. Mass. Sept. 30, 2013) (noting that "[b]ased on their substantial review of the record and consistency with the record, the non-treating physicians could reasonably be given great weight, and the ALJ thus did not err in according such"). Here, the little weight the ALJ assigned to the opinions of

Dr. Kirmes and Dr. Sanchez is supported by substantial evidence. Dr. Kirmes was a one-time examiner who indicated that he was not sure if his own assessment was valid, and his opinion is not consistent with the evidence of record, including the 2018 opinions of Dr. Venkataraman and Dr. Cioffi. Dr. Sanchez did not begin treating Scott until four months after his DLI, and his opinion was issued after four 25-minute visits. Pre-DLI evidence in the record, including the opinions of Dr. Venkataraman, Dr. Cioffi, and to a partial extent, Dr. Rosenthall, are not consistent with the extreme limitations Dr. Sanchez described. "An ALJ may consider retrospective diagnoses 'to the extent that such opinions both substantiate a disability that existed during the eligible period and are corroborated by evidence contemporaneous with the eligible period.'" Weeks v. Berryhill, No. CV 18-11553-JGD, 2019 WL 2441848, at *7 (D. Mass. June 11, 2019) (citing Marcotte v. Callahan, 992 F. Supp. 485, 491 (D.N.H. 1997)). To the extent that Dr. Sanchez's opinion is a retrospective diagnosis (he noted that he believed Scott's disability began in 2012, A.R. at 1087–88), it is not corroborated by contemporaneous evidence within the period prior to Scott's DLI. The ALJ did not err in afforded little weight to both opinions. Scott's Motion to Reverse is DENIED as to the issue of whether the ALJ erred in giving little weight to Dr. Kirmes and Dr. Sanchez's opinions, and the Commissioner's Motion to Affirm is ALLOWED as to this issue.

### 4. Dr. Venkataraman and Dr. Cioffi

Finally, Scott challenges the ALJ's decision to give "great weight" to the 2018 opinions of non-examining consultants Lisa Venkataraman, M.D., and Paula Cioffi, M.D. Doc. No. 15 at 20–21. In particular, Scott contends that the RFC is not consistent with Dr. Venkataraman and Dr. Cioffi's opinions because they opined that he was limited to sitting "[a]bout 6 hours in an 8-

hour workday" while the ALJ found that Scott's "ability to sit is unrestricted." Id.; see also A.R. at 685, 801, 815.

Dr. Venkataraman reviewed the record and produced an opinion on October 1, 2018, and Dr. Cioffi did so on December 12, 2018. A.R. at 798–802, 812–16. Both consultants opined that until December 31, 2017, the DLI, Scott could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for 4 hours; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and push and/or pull without limitation. Id. at 801, 815. Both consultants also opined that Scott could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawling, and never climb ladders/ropes/scaffolds. Id. at 801–02, 816. Both consultants found that these limitations overall effectively limited Scott to work at no more than the sedentary exertional level. Id. at 801–02, 815–16. The ALJ gave "great weight to these opinions because they are consistent with the evidence of record before the date of last insured, which reflected only moderate objective signs as discussed above," and further stated that "their assessments were generally adopted in the above residual functional capacity." Id. at 688. While the ALJ found an RFC of light work, he noted that "even if a sedentary exertional level were adopted, the claimant would still be considered not disabled . . .." Id.

As a preliminary matter, the ALJ did not err in giving great weight to these opinions. Because "state agency physicians and consultants are experts in social security disability programs, their opinions on the nature and severity of a claimant's impairments cannot be ignored by an ALJ." Moss v. Astrue, No. 1:10-CV-054-JL, 2011 WL 1517988, at *15–16 (D.N.H. Apr. 21, 2011) (citing SSR 96–6p, 1996 WL 374180, at *2 (July 2, 1996); 20 C.F.R. §§ 404.1527(f), 416.927(f)). "[T]he First Circuit explained [that] an advisory report of a non-examining, non-testifying physician is entitled to evidentiary weight, which will vary with the

circumstances, including the nature of the illness and the information provided the expert."
Reeves v. Barnhart, 263 F. Supp. 2d 154, 161 (D. Mass. 2003) (citations omitted); see Berrios
Lopez, 951 F.2d at 431. An ALJ may reasonably rely more heavily on a non-treating physician's
opinion than that of a treating physician where the non-treating opinion is supported by the
objective medical evidence, and, in contrast, the treating physicians' opinions "are, for the most
part, based on [the claimant's] own descriptions of pain . . .." Reeves, 263 F. Supp. 2d at 161. Dr.
Venkataraman and Dr. Cioffi reviewed the full record prior to Scott's DLI (both at the initial and
reconsideration level), they are familiar with the disability program, and their opinions regarding
the severity of Scott's physical limitations are supported by objective medical evidence in the
record. See 20 C.F.R. § 404.1527(c)(3)-(4) (more weight will be given to medical opinions that
that "present[] relevant evidence to support" the opinion and for opinions that are "consistent . . .
with the record as a whole"). Scott's treatment notes indicated that he had "normal strength,
normal gait, station and posture, no lower extremity tenderness, and normal range of motion
without pain," which comports with the limitations discussed by Dr. Venkataraman's and Dr.
Cioffi's opinions. A.R. at 688 (citing id. at 1129–30, 1140–41); id. at 801–02, 815–16.

However, the ALJ did err in concluding that Scott could perform "unrestricted" sitting
without explaining the discrepancy between this finding and the opinions of Dr. Venkataraman
and Dr. Cioffi, both of whom opined that Scott could sit no longer than six hours in an eight-hour
workday. Id. at 685, 801–02, 815–16. The ALJ does not explain this finding, nor does the ALJ
point to any other citations or findings in the record supporting a finding of "unrestricted"
sitting—in fact, every medical opinion in the record places at least some limitation on Scott's

ability to sit, with six hours at the highest end.[8] Scott's own testimony was that on his best day, he could not sit for more than twenty-five minutes at a time without experiencing significant pain. Id. at 720.

The Commissioner argues that this error is harmless, and that harmless errors do not warrant remand. Doc. No. 24 at 18; see Slater v. Berryhill, No. 16-30147, 2017 WL 4181349, at *8 (D. Mass. Sept. 21, 2017). The Commissioner posits that this error is harmless because the "the ALJ found that Plaintiff could perform the requirements of both sedentary and light work . . . and relied on jobs from both categories as testified to by the vocational expert." Doc. No. 24 at 18. Even if Scott could not perform some of the light work jobs suggested by the vocational expert, the Commissioner points out that sedentary jobs do not require more than six hours of sitting, and Dr. Cioffi and Dr. Venkataraman opined that Scott could sit for six hours. Id.; see SSR 96-9p, 1996 WL 374185, at *3 (Jul. 2, 1996) (sitting in sedentary work "would generally total about 6 hours of an 8-hour workday"). However, this logic requires the Court to simply assume that the ALJ meant to adopt Dr. Venkataraman and Dr. Cioffi's opined "six hours of sitting" where he wrote "unrestricted" sitting, rather than a lower or different number that would subsequently affect the number and type of jobs available to Scott, and potentially the disability determination. The Court cannot fairly make this assumption. This error is not harmless. Further, the ALJ does not rely on objective medical evidence for why Scott can perform "unrestricted"

---

[8] Dr. Venkataraman and Dr. Cioffi opined that Scott could sit no longer than six hours in an eight-hour workday, A.R. at 801–02, 815–16; Dr. Rosenthall opined the same six-hour limitation, id. at 95–97; Dr. Kirmes opined that Scott could sit no more than two hours at a time and no more than three hours total in an eight-hour workday, id. at 659–61; and Dr. Sanchez opined that Scott could sit for only fifteen minutes at a time and for no more than two hours total in an eight-hour workday, id. at 1088–89.

sitting, and an ALJ is not permitted to "substitute his own laymen's opinion for the findings and opinion of a physician." <u>Gonzalez Perez</u>, 812 F.2d at 749.

The ALJ's decision to afford great weight to the opinions of Dr. Venkataraman and Dr. Cioffi was not by itself erroneous. However, the ALJ erred in finding that Scott's "ability to sit is unrestricted"—this finding is not supported by substantial evidence. Scott's Motion to Reverse is thus ALLOWED as to the issue of whether the ALJ erred in finding that Scott's "ability to sit is unrestricted," and the Commissioner's Motion to Affirm is DENIED as to this issue.

## IV. CONCLUSION

For the foregoing reasons, Scott's Motion for Order Reversing the Decision of the Commissioner (Doc. No. 14) is ALLOWED IN PART and DENIED IN PART; the Commissioner's Motion to Affirm the Commissioner's Decision (Doc. No. 23) is ALLOWED IN PART and DENIED IN PART; and the case is REMANDED for further consideration consistent with this opinion, specifically as to the issue of Scott's "unrestricted" sitting as discussed in Part III.B.4. A separate judgment will issue.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge